**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> v. <br><br> ARA MESROPIAN, <br><br> *Defendant.* | Crim. No.: 3:11-cr-00512-PGS <br><br> **MEMORANDUM** |

This matter is before the Court on Defendant Ara Mesropian's ("Defendant") Motion to Return Oppenheimer Funds to Helen Mesropian and for Re-determination of Restitution Amount. (ECF No. 42). This Memorandum only addresses Defendant's application to release Ara Mesropian's garnished share of funds previously held in an Oppenheimer account and to return those funds to Defendant's mother (Helen Mesropian) as the alleged rightful owner.

The issue before the Court is whether the garnished monies, which were from a joint account in the name of five family members, belong solely to Helen. Under New Jersey law, a presumption arises that a joint account belongs to account holders in equal shares. N.J.S.A. 17:161-4. This presumption may be rebutted by proof of net contributions to the account, evidence of a contrary intent manifested by contract or other clear and convincing evidence of a different intent. Here, the Mesropians

1

allege that at the time the Oppenheimer account was garnished by the Government, it was held solely by Helen Mesropian and none of it belonged to Defendant. The Government opposes the motion.

At an evidentiary hearing on January 19, 2023, the Court heard testimony from Defendant, Helen Mesropian, Marisa Mesropian, Satig Mesropian and Victoria Mesropian.[1] The Court sets forth its findings of fact and conclusions of law below.

### Findings of Fact

The Court finds the following facts:

1. On or around May 17, 2011, Defendant pleaded guilty to one charge of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. (ECF No. 4). This Court sentenced Defendant to 15 months of imprisonment and three years of supervised release, plus restitution. (ECF No. 16).

2. The Court ordered Defendant and his co-defendants who were involved in the same mortgage fraud scheme to pay restitution to the financial institutions that were victims of the scheme. Ara Mesropian was ordered to remit $1,179,222.87 in restitution, which he owed to five financial institutions. (ECF No. 16).

---

[1] In addition to the testimony heard and evidence admitted at the evidentiary hearing, the Court considers several certifications submitted by Defendant, including the Certification of Ara Mesropian, the Certification of Helen Mesropian, the Certification of James R. Murphy, the Supplemental Certification of James R. Murphy and the Supplemental Certification of Helen Mesropian. (ECF Nos. 42, 46).

2

3. In connection with Defendant's judgment, on or around May 1, 2017, the Government served a writ of garnishment upon account no. XXX-XXXX997 held at Oppenheimer & Co. Inc. (the "'997 Account").

4. At that time, the '997 Account was held in the names of five individuals – Ara Mesrpian, Helen Mesropian (Defendant's mother), Marisa Mesropian, Victoria Mesropian and Satig Mesropian (Defendant's sisters).

5. Charles Mesropian, Defendant's deceased father and Helen Mesropian's late husband, opened the '997 Account, and later added Helen as a beneficiary. (Def. Cert. at ¶ 3; Helen First Cert. ¶ 2, Ex. A).

6. Sometime in 2013, Charles' name was removed from the '997 Account, and Marisa, Satig, Victoria and Ara Mesropian (the "Mesropian Children") were added. (Helen First Cert. at ¶¶ 2, 7).

7. In connection with an agreement between the parties, the Government agreed to withdraw the writ of garnishment on the '997 Account, and Defendant agreed to have his counsel, James R. Murphy, retain 20% of the funds ($291,886.48) in the '997 Account. (ECF No. 40). The other 80% of the funds was released. (Murphy Cert. ¶¶ 3,4). In other words, the parties' agreed that the Government had no right to garnish any more than Ara's 20% interest in the '997 Account, subject to Helen Mesropian's claim in this application.

8. Helen Mesropian testified about the formation of the '997 Account, the addition of the children as joint account holders, and whether she or Charles intended to gift those funds to their children (including Defendant). She testified "Absolutely no. I don't give gifts. That document was for -- to make it easier for me. My husband had a weak heart, and we discussed it, and I said I don't want any problems with probate or anything else later." (Jan. 19, 2023 Hearing T. 15:18-16:3).

9. Helen further testified that the '997 Account was funded with money from both her and Charles' investments. (T. 16:10-21). The money for those investments came from her and Charles' salaries. (T. 25:7-21). While Helen was employed for the large part of the marriage, she acknowledged that Charles was the "big money maker." (T. 25:24-27:18; 44:23-46:8).

10. Helen's testimony and certifications were riddled with inconsistencies. Within Helen's first certification, she stated that "My husband Charles Mesropian . . . opened the brokerage account that eventually became the Oppenheimer ['997] Account . . . at some time before 1992. It was opened, and additional deposits were made to it, by my husband solely with his own hard-earned money." (Helen First Cert. ¶ 1). She adds "The ['997] Oppenheimer Account was originally opened by my late husband . . . . At some point prior to 1992 he added my name to the ['997] Account . . . ." (*Id.* at ¶ 2).

11. Within her supplemental certification, Helen corrects certain statements made in her first certification and states she does not recall whether the brokerage account which eventually became the '997 Account was opened solely in Charles' name or in their joint name. (Helen Suppl. Cert. ¶ 5). She further states:

> I erroneously stated in my original certification in this matter that the Joint Account was funded by my husband with his hard-earned money, and that all the funds came from him. In fact . . . they came from a joint account that was funded by income on investments made by my husband and myself in our joint names. I credited the creation of the Account to his hard work as his business was the primary source of the money that we invested together. In fact, our money was never segregated; all of our investments were initially made with money from a joint bank account into which both of our paychecks were deposited.

(*Id.* at ¶ 7).

12. At the hearing, Helen first testified that Charles opened the '997 Account and subsequently transferred the '997 Account to her name (T. 10:17-11:5); but then she seemingly changed her testimony stating "I don't know – when he opened the account, I don't know if it was under his name alone or joined. He would have done everything joined." (T. 11:6-9).

13. She further testified that the money in the '997 Account came from investments held jointly by her and Charles, and the children did not contribute any funds to the '997 Account. (T. 16:10-21).

14. On cross-examination, Helen testified:

> I don't -- let me put it this way; when we invested in something or the stock -- the stock market or whatever, we discussed things, but you only need one mouthpiece, you don't need two mouthpieces. He was the one that was in contact with Harry, Harry Chartikian was our broker, also a friend; okay? So I don't know how the account was originally set up. But if it was set up after we were married, I would guess that he would put my name on it also.

(T. 31:6-25).

15. She further testified that she was responsible for removing Charles' name from the '997 Account, as he had desired at the time, and she added the children to the '997 Account. (T. 36:3-37-1). This testimony is contrary to the statements in her first certification, in which she stated Charles added the names of their children to the '997 Account. In response to questioning on her inconsistent statements, Helen testified "It's a generational thing. When big decisions are made by my generation, we give credit to the husband; all right? Anything that we did was joint." (T. 42:12-43:10).

16. Defendant's three sisters – Marisa, Victoria and Satig Mesropian provided substantially similar testimony regarding the '997 Account. At the time they signed the document establishing the '997 Account as a joint account, each sister was competent, lucid and of the age of majority. (T. 54:24-25; 59:1-3; 65:14-17). Each lacked knowledge of the '997 Account until the Government garnished the funds in connection with the criminal case against their brother. (T. 51:6-52:6; 57:19-58:19; 63:6-64:7).

17. On cross-examination each sister testified that they each signed documents that their parents directed them to sign without reading or understanding same. Each acknowledged signing an Oppenheimer document (Def. Exh. A), albeit without reading it, that added each of them as joint tenants to the '997 Account. (T. 49:14-51:5; 56:2-57:18; 64:8-65:10).

18. Defendant certified that his father, Charles, established the Oppenheimer Account "with his own hard-earned money to provide for himself and my mother in her golden years. He added our names under the belief that doing so would simplify the transfer of the '997 Account to us on the eventual demise of my mother." (Def. Cert. at ¶ 3).

19. Defendant testified that he first learned of the '997 Account after it was garnished by the Government in or around 2017, (T. 80:21-25; 81:9-12), and that he did not know his father's intent with respect to the '997 Account. (T. 81:9-12). He further testified that he made assumptions in his certification regarding who added the names of the Mesropian children to the '997 Account and whether it was his mother or his father. (T. 81:8-83:9).

20. At the time Defendant signed the form that established the joint tenancy of the '997 Account, he did not know the primary purpose or the amount of money in the '997 Account. (T. 77:4-12).

21.  Each party admitted three exhibits into evidence. The Government admitted the first certification of Helen Mesropian, the supplemental certification of Helen Mesropian and the Certification of Ara Mesropian. (Government Exh. A, B, C). Defendant admitted select pages of Oppenheimer documents pertaining to accounts XXX-XXXX997, XXX-XXXX995 and XXX-XXXX559. (Def. Exh. A, B, C).

22.  Importantly, the Oppenheimer document pertaining to the '997 Account at issue here, account no. XXX-XXXX997, establishes the creation of the account as one of joint tenancy and lists the signatures of joint tenants – Helen, Satig, Marisa, Victoria and Ara Mesropian. (Def. Exh. A).

23.  Helen, Marisa, Satig, Victoria and Defendant acknowledged their respective signature on the Oppenheimer document establishing the '997 Account as a joint account. (T. 13:17-14:21, 49:14-50:1, 56:2-15, 62:23-63:16, 68:20-69:13; Def. Exh. A).

24.  At the present time, the '997 Account is registered solely in Helen's name. (T. 17:20-18:10).

## Conclusions of Law

With those findings, the Court makes the following conclusions of law.

1.  The New Jersey Multiple-Party Deposit Account Act, N.J.S.A. 17:16I-4, (the "MPDAA") states, in pertinent part:

8

>  Unless a contrary intent is manifested by the terms of the contract, or the deposit agreement, or there is other clear and convincing evidence of a different intent at the time the account is created:
>
>  a. A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit. In the absence of proof of net contributions, the account belongs in equal shares to all parties having present right of withdrawal. This subsection shall not be construed to affect the right of the court to effectuate an equitable distribution of property between the parties in an action for divorce pursuant to N.J.S.A. 2A:34-23.

2.  The MPDAA "creates a presumption that a joint account belongs to . . . account holders in equal shares." *State ex rel. Allstate Ins. Co. v. Patel*, No. A-1437-18T3, 2019 WL 6598239, at *5 (N.J. Super. Ct. App. Div. Dec. 5, 2019); *see Argenbright Holdings IV, LLC v. Gateway Sec., Inc.*, No. CV 22-93 (ES) (MAH), 2022 WL 2833959, at *3 (D.N.J. July 20, 2022). The presumption of equal ownership is rebuttable by "present proof of net contributions to the joint account[]." *Argenbright Holdings IV*, 2022 WL 2833959 at *3 (internal quotation marks and citation omitted).

3.  In addition, the presumption may be rebutted by "a contrary intent . . . manifested by the terms of the contract, or the deposit agreement, or . . . other clear and convincing evidence of a different intent at the time the account is created". N.J.S.A. 17:16I-4.

4.     Clear and convincing evidence "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In re Purrazzella*, 134 N.J. 228, 240 (1993) (internal quotation marks and citation omitted). The evidence must be "so clear, direct, and weighty and convincing as to enable either a judge or a jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Est. of Balgar*, No. A-6621-04T5, 2007 WL 1147081, at *4 (App. Div. Apr. 19, 2007) (internal quotation marks and citation omitted).

5.     The judgment-debtor bears the burden of proving that the funds are not subject to levy because he or she is in the "best position to offer proof regarding ownership of the joint bank account." *Argenbright Holdings IV*, 2022 WL 2833959, at *3 (internal quotation marks and citation omitted).

## Analysis

The Court's analysis is guided by the MPDAA's statutory framework. Under the MPDAA's presumption, the '997 Account -- at the time it was garnished by the Government -- belonged in equal shares to Helen Mesropian, Marisa Mesropian, Satig Mesropian, Victoria Mesropian and Defendant as joint tenants. As such, Defendant is presumed to have a 20 percent ownership interest in the '997 Account.

The only proof of contributions to the '997 Account arises from statements of Helen's testimony and certifications. However, these statements were

inconsistent. At first, she certified that Charles solely funded '997 Account. In a subsequent certification and at the hearing, she stated that she and Charles contributed to the '997 Account with funds from joint investments that were made with money from their salaries. Marisa, Victoria and Satig testified that they had no knowledge of the '997 Account until it was levied upon by the Government or what their father intended of the '997 Account. (T. 53:3-7; 59:7-12; 65:18-66:10).

Defendant certified that he did not contribute to the '997 Account and that it was Charles' intent for the '997 Account to provide for him and Helen's retirement. At the same time, Defendant testified and certified in writing that he did not know about the '997 Account's existence until it was frozen by the Government years after Charles' death. The proffered evidence is self-serving, contradictory and uncorroborated by any documentary evidence. Thus, the Court declines to give it much weight.

Instead, the Court will honor the "clear, contemporaneous, written expressions" set forth in the Oppenheimer Account document, admitted at the January 19, 2023 hearing. (Defendant's Exhibit A). That document established the joint tenancy of the '997 Account and bears the signatures of Defendant, Helen, Marisa, Satig, and Victoria Mesropian. *See High v. Balun*, 943 F.2d 323, 326 (3d Cir. 1991). There is no clear and convincing evidence that some of the

11

contributions to the '997 Account originated from Helen. As such, the '997 Account document controls.

The Court recognizes the common practice of creating joint accounts as a means of testamentary disposition, or a "poor man's will." In addition, there are inherent challenges in locating documents and recollecting information from decades ago regarding creation of the '997 Account, funding of the '997 Account, and the intentions for establishing joint tenancy. Still, the evidence presented is insufficient to rebut the presumption of equal ownership in the '997 Account. Thus, under the MPDAA, the '997 Account belonged in equal shares to Helen, Marisa, Victoria, Satig and Ara Mesropian. In light of this outcome, the Court need not determine whether an *inter vivos* gift was made. As such, an Order (under separate cover) shall be entered denying this part of Defendant's motion, and requiring Ara Mesropian's share of the garnished funds previously held in the Oppenheimer Account ('997 Account) be turned over to the United States.

                                                *[signature]*
                                             PETER G. SHERIDAN, U.S.D.J.